**Opinion issued February 25, 2014**



In The

# Court of Appeals

For The

## First District of Texas

———————————

**NO. 01-13-00129-CR**

———————————

**REGINALD TYRONE HOLLINS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 177th District Court**
**Harris County, Texas**
**Trial Court Case No. 1342022**

---

**MEMORANDUM OPINION**

A jury convicted appellant, Reginald Tyrone Hollins, of aggravated robbery

with a deadly weapon[1] and, based on two enhancements, assessed his punishment

at confinement for life. In two issues, appellant argues that (1) the show-up

---

[1]  *See* TEX. PENAL CODE ANN. §§ 29.02, 29.03(a)(2) (Vernon 2011).

procedure used by police officers to obtain the complainant's identification of appellant was so unduly suggestive as to warrant exclusion and (2) his custodial statement was rendered involuntary because of promises made by the interrogating officer. We affirm.

## Background

On February 19, 2011, two armed men wearing ski masks robbed an Auto Zone store located at the intersection of Seaford and Fuqua in Harris County. George Blair, the complainant in this case, testified that he was working the closing shift at the Auto Zone when the store was robbed. He testified that two men wearing black and carrying firearms ran into the store. The second man in particular approached Blair with his gun drawn and instructed Blair to lie down on the floor. Blair testified that the man was wearing jeans, a black shirt, and a mask. In spite of the mask, Blair could see the man's eyes, nose, and skin color, and he could see that the man was wearing glasses. Blair stated that he observed the man "face-to-face" and "was looking directly at him." At the suppression hearing, Blair identified appellant as the second man who came into the store and robbed him. He testified that, even though appellant wore a mask during the robbery, he was able to identify appellant by "skin color, his nostril features and the glasses he had on."

Regarding the show-up procedure, Blair testified that the police did not provide him with any information about the suspects; they only instructed him to come outside and see if he recognized any of the suspects. Blair viewed three suspects, but appellant was the only suspect he recognized. He stated that he recognized appellant "instantly" and had no hesitation. Blair further testified that his in-court identification of appellant was based on what he saw inside the Auto Zone during the robbery. Blair also testified at trial and was cross-examined by appellant's attorney.

Officer B. Graham testified that he responded to the call of a robbery in progress at the Auto Zone. A witness at the scene informed him that the robbers had left the parking lot in "a black Impala with rims" and had traveled north on Seaford. Officer Graham immediately returned to his vehicle and pursued the suspects. He testified that it took only seconds—"[w]ay less than a minute"—for him to come into contact with a vehicle matching the witness's description. Graham testified that the occupants refused to comply with the officers' verbal commands to exit the vehicle, so the officers had to forcibly remove the suspects from the vehicle. Appellant was one of the men officers removed from the Impala. Officer Graham testified that, upon searching the car, officers discovered ski masks, black gloves, firearms, and a bag of money.

3

Sergeant H. Meisel testified that after officers had stopped the vehicle they put each suspect into a separate police vehicle and drove them back to the Auto Zone. Sergeant Meisel testified that he returned to the Auto Zone with the suspects within approximately ten to fifteen minutes after receiving the original dispatch call. Meisel stated that when the officers returned to the Auto Zone they parked their patrol vehicles on the south corner of the lot, "not in front of the door." The officers then brought the suspects forward, one at a time, to the door where Blair was waiting, to see if he could identify any of the suspects. Sergeant Meisel testified that the only instruction he gave Blair was to "[l]et me know if you recognize anybody." He did not inform Blair that the suspects had been stopped down the street from the Auto Zone or that any of them might be one of the suspects who had been involved in the robbery, nor did he give Blair any hint or clue as to who the suspects were. Sergeant Meisel agreed that the suspects, including appellant, were handcuffed when they were presented to Blair for identification. Meisel stated that this was because "[w]e had just stopped them from leaving the scene of a violent crime and in that vehicle there was three weapons involved and which we recovered. So they were at that point detained."

Sergeant Meisel also testified that Blair made a positive identification of appellant quickly, "[l]ess than 30 seconds" after officers brought him forward for

4

Blair to see. He further testified that Blair told Officer Meisel "he was absolutely sure" appellant had been involved in the robbery and did not equivocate at all.

Appellant moved to suppress the show-up identification at the scene and any subsequent identification as being tainted "by the police improperly showing one person that's in custody, handcuffed, to the witness and getting identification. We think that's improper and unduly suggestive." The trial court denied the motion.

At the suppression hearing to determine the admissibility of appellant's custodial statement, Officer S. Neal testified that he read appellant the mandatory warnings and that appellant indicated he understood the warnings. Officer Neal stated that he did not threaten or coerce appellant, and he testified that he made no promises to appellant, stating, "I told him I wouldn't be able to [make any promises] because he asked quite a bit about that." Officer Neal testified, "I don't remember the exact details of what he was asking for, but he was basically asking if he gave up information we'd be lenient on him." Officer Neal stated that he told appellant he "didn't have the authority to do that."

Officer Neal testified that appellant brought up the topic of his receiving a bond. Neal testified that he did not promise an exact amount or make any promises regarding a bond. He stated that he repeatedly told appellant, in response to appellant's questions regarding getting a deal from the prosecutors for other information and questions about a bond, that he did not have authority to make

5

deals and that he could not advise appellant on what to do. On cross examination, appellant's counsel asked, "Did you not say the words, 'You are getting a bond. I guarantee you you're getting a bond'? Did you not say that to him?" Officer Neal replied, "I don't know; but if did, I was right because he got one."

Appellant moved to suppress the statement, arguing that it was coerced because Officer Neal led him to believe he could get some kind of deal in return for cooperating and giving his statement. The trial court ruled that appellant's statement about the robbery was admissible and found, "[B]ased on what I saw on the recorded statement, he did knowingly and voluntarily waive his rights and agree to talk to Officer Neal." A redacted version of his statement, in which appellant acknowledged his participation in the robbery, was published to the jury. The jury found him guilty, and this appeal followed.

## Motion to Suppress

In two issues, appellant argues that the trial court erred in denying his motions to suppress evidence of the show-up identification and his custodial statement.

## A.     Standard of Review

We review a denial of a motion to suppress evidence for an abuse of discretion. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008) (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). When we review a

trial court's denial of a motion to suppress, we give "almost total deference to a trial court's express or implied determinations of historical facts [while] review[ing] de novo the court's application of the law of search and seizure to those facts." *Id.* We view the evidence in the light most favorable to the trial court's ruling. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007) (quoting *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006)). The trial court is the "sole trier of fact and judge of credibility of the witnesses and the weight to be given to their testimony." *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). The trial court may choose to believe or disbelieve any part or all of a witness's testimony. *Green v. State*, 934 S.W.2d 92, 98 (Tex. Crim. App. 1996). We sustain the trial court's ruling if it is reasonably supported by the record and correct on any theory of law applicable to the case. *Laney v. State*, 117 S.W.3d 854, 857 (Tex. Crim. App. 2003).

**B. Show-Up Identification**

In his first issue, appellant argues that the trial court erred in denying his motion to suppress Blair's pre-trial and in-court identifications of him, arguing that they were tainted by an impermissibly suggestive pre-trial identification procedure.

"[A] pre-trial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law." *Barley v. State*, 906 S.W.2d 27, 32–33

7

(Tex. Crim. App. 1995) (citing *Stovall v. Denno*, 388 U.S. 293, 87 S. Ct. 1967 (1967)). When faced with a challenge to an out-of-court identification, a trial court should review all of the circumstances surrounding the identification and determine whether a procedure was unduly suggestive and, if so, whether it was conducive to an irreparable mistaken identification such that it denied the defendant due process of law. *Webb v. State*, 760 S.W.2d 263, 272 (Tex. Crim. App. 1988); *see Barley*, 906 S.W.2d at 33–34. The defendant bears the burden to show both impermissible suggestion and a substantial likelihood of misidentification by clear and convincing evidence. *See Barley*, 906 S.W.2d at 33–34. An analysis under these steps requires an examination of the totality of the circumstances surrounding the particular case and a determination of the reliability of the identification. *Id.* at 33.

Single suspect show-up identifications can be impermissibly suggestive. *See e.g.*, *Stovall*, 388 U.S. at 302, 87 S. Ct. at 1972. However, such confrontations have been acknowledged as being necessary in many cases. *See, e.g.*, *Garza v. State*, 633 S.W.2d 508, 512 (Tex. Crim. App. 1981); *Fite v. State*, 60 S.W.3d 314, 318 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd); *Louis v. State*, 825 S.W.2d 752, 756–57 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd); *see also Jackson v. State*, 682 S.W.2d 692, 695 (Tex. App.—Houston [1st Dist.] 1984, pet. ref'd) ("The very nature of a single show-up identification conducted in the presence of

police officers is suggestive, but the real inquiry in such a case is whether the particular confrontation was so unnecessarily suggestive as to deny due process.").

As explained by the Court of Criminal Appeals, even a one man "on-the-scene" show-up, without more, does not necessarily violate due process:

> While it must be conceded that an on-the-scene confrontation has some degree of suggestiveness, in many situations its use is necessary. First of all by viewing the alleged perpetrator of the offense immediately after the commission of the offense, the witness is allowed to test his recollection while his memory is still fresh and accurate. Additionally the quick confirmation or denial of identification expedites the release of innocent suspects. Thus the innocent suspect need not be transported to jail and detained until a lineup can be constructed. Furthermore the police would be able to release the innocent suspect and continue their search for the criminal while he is still within the area and before the criminal can substantially alter his looks and dispose of evidence of the crime. Finally, any possible prejudice resulting from such a confrontation can be exposed by rigorous cross-examination of the witness.

*Garza*, 633 S.W.2d at 512 (internal citations omitted).

Suggestiveness may be created by the manner in which the pre-trial identification procedure is conducted, for example by police pointing out the suspect or suggesting that a suspect is included in the line-up or photo array. *Barley*, 906 S.W.2d at 33. Or it may also be created by the content of the line-up or photo array itself if the suspect is the only individual closely resembling the pre-procedure description. *Id.* (citing *Williams v. State*, 675 S.W.2d 754, 756 (Tex. Crim. App. 1984)). Furthermore, an individual procedure may be suggestive or the cumulative effect of the procedures may be suggestive. *Id.*

9

If the trial court determines that an out-of-court identification was impermissibly suggestive, then the court should consider the factors enumerated in *Neil v. Biggers* to determine whether the suggestive procedure created a substantial likelihood of irreparable misidentification. 409 U.S. 188, 199–201, 93 S. Ct. 375, 382–83 (1972); *Barley*, 906 S.W.2d at 34–35. These factors are: (1) the witness's opportunity to view the criminal act; (2) the witness's degree of attention; (3) the accuracy of the suspect's description; (4) the level of certainty at the time of confrontation; and (5) the time between the crime and confrontation. *Neil*, 409 U.S. at 199–201, 93 S. Ct. at 382–83; *Barley*, 906 S.W.2d at 34–35. These factors are weighed against the corrupting effect of any suggestive identification procedures. *Barley*, 906 S.W.2d at 34.

Reliability is the "linchpin" in determining admissibility of such identification testimony. *Id.* (quoting *Manson v. Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243 (1977)). If indicia of reliability outweigh suggestiveness, then an identification is admissible. *Id.*

### 1. *Was the procedure unduly suggestive?*

We begin our analysis by determining whether the show-up procedure used in this case was unduly suggestive. Appellant argues that the show-up was impermissibly suggestive because appellant was removed from a police car and was wearing handcuffs at the time he was presented to Blair for identification.

Thus, he argues, "the custodial nature" in which he was shown to Blair lent a suggestion of guilt and was impermissibly suggestive.

However, the record shows that appellant was not the only suspect shown to Blair. Rather, Blair testified that he was shown three suspects total but only identified appellant as one of the robbers. Although the record indicates that appellant was handcuffed and accompanied by law enforcement officers when shown to Blair at the scene, so were all of the suspects shown to Blair at the scene. The show-up identification of appellant occurred no more than thirty minutes after the robbery. *See Garza*, 633 S.W.2d at 512 (on-scene identification can be necessary to allow police to "continue their search for the criminal").

Furthermore, nothing in the record shows that the officers at the scene encouraged Blair, by word or action, to identify appellant as the suspect; in fact, Blair specifically testified that the police asked only if he recognized any of the suspects and did not make any other suggestions or comments. Nor did appellant assert that he was treated differently than the two other suspects that Blair was unable to identify. *See Barley*, 906 S.W.2d at 33 (suggestiveness can be created by manner in which identification procedure is conducted or by content). Also, Blair testified that he based his in-court identification of appellant on his observations of the assailant at the time of the robbery, and he was cross-examined by appellant's attorney at trial.

We conclude that appellant has not shown by clear and convincing evidence that there was any abuse of the show-up procedure. *See id.* (holding that "the procedures utilized might have been suggestive, but not *impermissibly* so" where photo array, out of necessity, contained photos with slightly different lighting and background or suspects of slightly different heights); *Louis*, 825 S.W.2d at 754, 756 (concluding on-scene identification not impermissibly suggestive when confrontation occurred one hour after offense, witness immediately identified defendant, and cross-examination could have exposed any possible prejudice resulting from show-up identification).

### 2. *Was there a substantial likelihood of irreparable misidentification?*

We also conclude that Blair's identification of appellant was sufficiently reliable to be admissible. *See Garza*, 633 S.W.2d at 512.

Here, Blair had an opportunity to view the criminal act, as he was the complainant. He testified that he stood face-to-face with appellant during the robbery and looked directly at him. He saw the man's eyes, nose, and skin color, and he could see that the man was wearing glasses. Blair testified that he was able to identify appellant in spite of the ski mask by "skin color, his nostril features and the glasses he had on." *See id.* at 513 ("It is true that the witnesses were not able to view the facial features of the appellant at the time of the offense. . . . However, such matters go to the weight to be given the evidence and not to its

12

admissibility."). Both Blair and Sergeant Meisel testified that Blair immediately recognized appellant and was confident of his identification. Furthermore, Blair testified that police returned to conduct the show-up identification approximately twenty to thirty minutes after the robbery had occurred. All of these facts weigh in favor of the reliability of Blair's identification of appellant as one of the assailants.

Furthermore, other indicia of reliability support the admission of Blair's identification. *See Barley*, 906 S.W.2d at 34 (stating that reliability is "linchpin" in determining admissibility of out-of-court identification and that, if indicia of reliability outweigh any suggestiveness, identification is admissible). The record demonstrates that a witness at the scene informed the police that three black males in a black Impala with rims had just left the scene driving north on Seaford. Officer Graham testified that he immediately returned to his vehicle and pursued the suspects. He testified that it took only seconds—"[w]ay less than a minute"— for him to come into contact with the vehicle matching the witness's description. Appellant was one of the three men riding in the Impala, and, upon searching the car, officers discovered ski masks, black gloves, firearms, and a bag of money. Officers returned to the Auto Zone with the three men from the vehicle, and Blair immediately identified appellant as the assailant who had held him at gun point during the robbery.

13

Considering the totality of the circumstances, we conclude that appellant has not shown a substantial likelihood of misidentification by clear and convincing evidence. *See Barley*, 906 S.W.2d at 33–34.

We overrule appellant's first issue.

## C.    Custodial Statement

In his second issue, appellant argues that the trial court erred in denying his motion to suppress his custodial statement. Appellant argues that his statement was coerced because the interrogating officer promised that appellant would receive a bond in exchange for his statement and that the officer would inform the prosecutors of appellant's cooperation.

"A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion." TEX. CODE. CRIM. PROC. ANN. art. 38.21 (Vernon 2005). When considering whether a statement was voluntarily made, we consider the totality of the circumstances in which the statement was obtained. *Creager v. State*, 952 S.W.2d 852, 855 (Tex. Crim. App. 1997). A defendant's statement is involuntary if it is induced by a promise that was positive, made or sanctioned by someone in authority, and of such an influential nature that it would cause a defendant to speak untruthfully. *Martinez v. State*, 127 S.W.3d 792, 794 (Tex. Crim. App. 2004). We must determine whether the officially sanctioned positive promise would be likely

14

to influence the defendant to speak untruthfully and not whether the defendant in fact spoke untruthfully. *Id.* at 794–95. To determine if the alleged promise was likely to influence the defendant to speak untruthfully, we must consider whether the circumstances surrounding the promise made the defendant inclined to confess to a crime he did not commit. *See e.g.*, *Garcia v. State*, 919 S.W.2d 370, 388 (Tex. Crim. App. 1994) (en banc) (op. on reh'g).

Courts have held that general, unspecific offers to help are not likely to induce one to make an untruthful statement and will not invalidate a confession. *See Dykes v. State*, 657 S.W.2d 796, 797 (Tex. Crim. App. 1983). Likewise, general statements made to a suspect regarding how a confession can sometimes result in leniency do not render a confession involuntary. *See Muniz v. State*, 851 S.W.2d 238, 253–54 (Tex. Crim. App. 1993). Nor is a prediction about future events a promise. *See Mason v. State*, 116 S.W.3d 248, 261 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (holding that officer's statements that situation would "go better" for appellant if he confessed was prediction about future event that did not amount to promise).

Here, Officer Neal testified that he did not threaten or coerce appellant, and he testified that he made no promises to appellant, stating, "I told him I wouldn't be able to [make any promises] because he asked quite a bit about that." Officer Neal repeatedly told appellant that he "didn't have the authority" to make a deal

15

with appellant, in spite of appellant's repeated inquiries into the availability of a bond and his repeated volunteering of information in unrelated cases. Officer Neal testified that he did not promise an exact amount or make any promises regarding a bond. Although appellant argues that Officer Neal said, "You are getting a bond. I guarantee you you're getting a bond," Neal stated that he did not know if he had said that, but if he did, "[he] was right because [appellant] got one."

Considering the totality of the circumstances, we conclude that the record does not support appellant's argument that Officer Neal made appellant a promise of a bond or of leniency in exchange for his statement. Any statement that Neal would inform the prosecutor of appellant's cooperation did not invalidate appellant's statement. *See Johnson v. State*, 68 S.W.3d 644, 654–55 (Tex. Crim. App. 2002) (officer's statement to defendant that his cooperation would be conveyed to trial court was not promise that induced confession); *Garcia*, 919 S.W.2d at 388 (detective's statements that he would try to "help" defendant and that he would talk to prosecutor did not render confession involuntary). Appellant argues that Officer Neal made an "emphatic" and "repeated" promise that appellant would receive a bond. However, Officer Neal testified that it was appellant who repeatedly offered information about unrelated cases and asked for a bond, and each time, Neal informed appellant that he did not have the authority to make a deal. Officer Neal also testified that he never promised an exact amount or made

any promises regarding appellant's bond. *See Dykes*, 657 S.W.2d at 797 (stating that non-specific offers to help are unlikely to elicit false statement by suspect and will not render confession invalid); *see also St. George*, 237 S.W.3d at 725 (holding that trial court is sole judge of credibility of witnesses and weight to be given to their testimony).

Given the context, any statements Officer Neal made regarding the availability of a bond were not specific promises, but were merely predictions about future events. *See Mason*, 116 S.W.3d at 260–61 (stating that predictions about future events are not promises). Nothing that Officer Neal said to appellant constituted a promise that was positive, made or sanctioned by someone in authority, and of such an influential nature that it would cause appellant to speak untruthfully. *See Martinez*, 127 S.W.3d at 794.

We conclude that the trial court did not erred in denying appellant's motion to suppress his custodial statement.

We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Bland, and Brown.

Do not publish.   TEX. R. APP. P. 47.2(b).